FILED ___ LODGED
___ RECEIVED ___ COPY

MAY 17 2021

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY ___ DEPUTY

Lon R. Leavitt
HALUNEN LAW
Arizona Bar No. 035825
One Renaissance Tower
Two North Central Avenue, Suite 1800
Phoenix, Arizona 85004
Telephone: (602) 254-6494
Fax: (612) 605-4099
leavitt@halunenlaw.com

Adam Pollock*
Max Rodriguez*
POLLOCK COHEN, LLP
60 Broad Street, 24th Floor
New York, New York 10004
Telephone: (212) 337-5361
adam@pollockcohen.com
max@pollockcohen.com

*Attorneys for Plaintiff/Relator*

SEALED

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America *ex rel.* Peter Donbavand,<br><br>Plaintiff-Relator,<br><br>v.<br><br>Alamo Buffets, LLC; Buffets, LLC; TXFMP Management, LLC; Zio's Restaurant Company, LLC; Sushi Zushi of Texas, LLC; Fresh Acquisitions, LLC; Alamo Dynamic, LLC; Allen Jones; Jason Kemp; Larry Harris; and Brian Padilla,<br><br>Defendants. | Case No.: **CV21-00869-PHX-SRB**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. §§ 3729, *et seq.***<br><br>**JURY TRIAL DEMANDED**<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

*Qui tam* plaintiff and Relator Peter Donbavand, through his undersigned attorneys, hereby brings this action pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

("FCA") on behalf of the United States of America against Alamo Buffets, LLC; Buffets, LLC; TXFMP Management, LLC; Zio's Restaurant Company, LLC; Sushi Zushi of Texas, LLC; Fresh Acquisitions, LLC; and Alamo Dynamic, LLC ("the Entity Defendants"); and Allen Jones; Jason Kemp; Larry Harris; and Brian Padilla ("the Individual Defendants") (collectively "Defendants"). The claims asserted in this Complaint are based on the facts and information set forth below.

## I. NATURE OF THE ACTION

1. Relator sues Defendants to recover treble damages and civil penalties on behalf of the United States for deceiving the United States Small Business Administration ("SBA") to receive approximately $19 million in Paycheck Protection Program ("PPP") loans guaranteed by the SBA, which also paid the lender significant origination fees, and using those funds to enrich themselves and other businesses they own.

2. In particular, instead of using the PPP loan proceeds for the program-authorized purposes of employee compensation and other costs of keeping their restaurant businesses up and running, Defendants comingled the proceeds and used them to settle lawsuits, purchase equipment for unrelated businesses, pay themselves excessive salaries in excess of what is permitted under the PPP regulations, and pay down approximately $4.5 to $6 million on lines of credit maintained by the Individual Defendants at the same bank that issued the PPP loans, thereby perpetrating fraud against the United States in violation of the FCA.

3. Relator was the senior vice president of real estate, legal, and business development at Food Management Partners, an entity that provided management and other services for the Entity Defendants. In that managerial role and through conversations with the Individual Defendants, Relator learned of Defendants' fraudulent schemes to misuse approximately $19 million in PPP loan proceeds.

4. Relator reported this fraud to executives at the Entity Defendants, including the Individual Defendants, but they ignored his concerns and continued with their fraudulent schemes.

## II. PARTIES

### A. Relator – Peter Donbavand

5. Relator Peter Donbavand is a resident of San Antonio, Texas.

6. Relator earned a bachelor of business administration in 2003 from Baylor University, where he studied real estate.

7. Relator joined Food Management Partners, which provides "management services" for the Entity Defendants and related entities, in or about April 2007 as a senior lease analyst.

8. In or about May 2010, Relator was promoted to vice president of legal and real estate.[1]

9. A few years later, Relator added business development to his portfolio as a vice president at Food Management Partners.

10. In early 2020, Relator was promoted to senior vice president of real estate, legal, and business development at Food Management Partners.

11. Starting in or about March 2015, Relator, through his entity PAD Realty LLC, became a minority member, either directly or through minority ownership in holding companies, in Alamo Buffets and Buffets, TXFMP Management, Zio's, and Sushi Zushi, among other businesses primarily owned by the Individual Defendants.

12. Relator worked in Food Management Partner's office in San Antonio, Texas.

### B. Entity Defendants

1. *<u>Alamo Buffets, LLC</u>*

13. Alamo Buffets, LLC ("Alamo Buffets") is an LLC formed in Texas.

14. Alamo Buffets is owned by LLCs controlled primarily by the Individual Defendants, along with other related parties.

///

[1] Relator is not a lawyer, nor do the allegations herein rely on any privileged materials.

15. Alamo Buffets is a holding company that owns several other holding companies, among them Buffets, LLC, which owned or operated businesses in Arizona and other states.

16. The same LLCs that own Alamo Buffets also own, in equal shares, Tahoe Joe's Inc., which owns several locations of the restaurant chain Tahoe Joe's. The organizational structure is represented below:




2. *Buffets, LLC*

17. Buffets, LLC ("Buffets") is an LLC formed in Minnesota.

18. Buffets owns corporations and LLCs that directly owned locations of the restaurant chains Hometown Buffet, Old Country Buffet, Ryan's, and Fire Mountain.[2]

[2] On April 20, 2021, Buffets and its subsidiaries, along with other related entities primarily owned or beneficially owned by the Individual Defendants, filed a petition for bankruptcy under Chapter 11. No. 21-30723-sgj11 (N.D. Tx. Bankr.). Relator's *qui tam* action is not affected by the automatic stay provisions of the Bankruptcy Code. *See, e.g.*, *U.S. ex rel. Doe v. X, Inc.*, 246 B.R. 817, 820 (E.D. Va. 2000). This is the second bankruptcy filed by Buffets, which previously filed a petition in 2016. *See In re: Buffets, LLC, et al.*, No. 16 bk. 50557 (W.D. Tex.).

19. Buffets' subsidiaries owned or operated restaurant locations in Arizona and other states.

20. Buffets was approved on April 13, 2020 to receive a $10 million PPP loan via Arizona Bank and Trust.

21. Despite receiving a $10 million PPP loan in April 2020 and certifying to SBA that it would use the loan proceeds for permissible purposes, Buffets had no intention of using the funds for these purposes.

22. Buffets had already closed down all of its beneficially-owned restaurant locations with no intention of reopening them or paying employees.

23. Instead, the loan funds were comingled with funds from other entities and used to pay the Individual Defendants' excessive salaries and personal expenses, debt and renovation expenses for other entities, and legal settlements and fees for other entities.

3. *TXFMP Management, LLC*

24. TXFMP Management, LLC ("TXFMP Management") is an LLC formed in Texas. TXFMP Management managed multiple businesses owned by the Individual Defendants in Arizona and other states, including Hometown Buffet.

25. TXFMP Management does business as Food Management Partners,[3] which provides "management services" for the Entity Defendants and related entities, and is primarily owned and controlled by the Individual Defendants.

26. TXFMP Management also employs the Individual Defendants and was the former employer of Relator through their payroll entity TX Alamo Business Group, LLC.

27. TXFMP Management was approved on April 13, 2020 to receive a $1,108,800 PPP loan via Arizona Bank and Trust.[4]

/ / /

---

3 Other entities controlled by the Individual Defendants also do business as Food Management Partners, including FMP SA Management Group, LLC.

4 On March 5, 2021, TXFMP Management was approved to receive a second PPP loan of $752,989, but that loan does not appear to have been disbursed.

28. Despite receiving a $1,108,800 PPP loan in April 2020 and certifying to SBA that it would use the loan proceeds for permissible purposes, TXFMP Management had no intention of using the funds for those purposes.

29. Instead, the loan funds were comingled with funds from other entities and were used to pay the Individual Defendants' excessive salaries and personal expenses, debt and renovation expenses for other entities, and legal settlements and fees for other entities.

4. *Zio's Restaurant Company, LLC*

30. Zio's Restaurant Company, LLC ("Zio's") is an LLC formed in Texas.

31. Zio's is a holding company that owns corporations and LLCs that directly own locations of the restaurant chain Zio's Italian Kitchen.

32. Zio's is owned by LLCs controlled primarily by the Individual Defendants, along with other related parties.

33. Zio's was approved on April 13, 2020 to receive a $1,488,600 PPP loan via Arizona Bank and Trust.[5]

34. Despite receiving a $1,488,600 PPP loan in April 2020 and certifying to SBA that it would use the loan proceeds for permissible purposes, Zio's had no intention of using the funds exclusively for those purposes.

35. While Zio's locations re-opened later in 2020, the loan funds were comingled with funds from other entities and were used in substantial part to pay the Individual Defendants' excessive salaries and personal expenses, debt and renovation expenses for other entities, and legal settlements and fees for other entities.

5. *Sushi Zushi of Texas, LLC*

36. Sushi Zushi of Texas, LLC ("Sushi Zushi") is an LLC formed in Texas.

37. Sushi Zushi is a holding company that owns corporations and LLCs that directly own locations of the restaurant chain Sushi Zushi.

---

[5] On March 24, 2021, Zio's was approved to receive a second PPP loan of $2 million, but that loan does not appear to have been disbursed.

38. Sushi Zushi is owned by LLCs controlled primarily by the Individual Defendants, along with other related parties.

39. Sushi Zushi was approved on April 12, 2020 to receive a $2,094,400 PPP loan via Arizona Bank and Trust.

40. Despite receiving a $2,094,400 PPP loan in April 2020 and certifying to SBA that it would use the loan proceeds for permissible purposes, Sushi Zushi had no intention of using the funds exclusively for those purposes.

41. While Sushi Zushi's locations re-opened later in 2020, the loan funds were comingled with funds from other entities and were used in substantial part to pay the Individual Defendants' excessive salaries and personal expenses, debt and renovation expenses for other entities, and legal settlements and fees for other entities.

6. *Fresh Acquisitions, LLC*

42. Fresh Acquisitions, LLC ("Fresh Acquisitions") is an LLC formed in Texas.

43. Fresh Acquisitions owned and operated locations of the restaurant chain Furr's Fresh Buffet.[6]

44. Fresh Acquisitions owns real estate and operated Furr's Fresh Buffet locations in Arizona and other states.

45. Fresh Acquisitions is owned by LLCs controlled primarily by the Individual Defendants, along with other related parties.

46. Fresh Acquisitions was approved on April 12, 2020 to receive a $2,996,600 PPP loan via Arizona Bank and Trust.

/ / /

/ / /

---

[6] On April 20, 2021, Fresh Acquisitions, along with other related entities primarily owned or beneficially owned by the Individual Defendants, filed a petition for bankruptcy under Chapter 11. No. 21-30721-sgj11 (N.D. Tx. Bankr.). Relator's *qui tam* action is not affected by the automatic stay provisions of the Bankruptcy Code. *See, e.g.*, *Doe*, 246 B.R. at 820.

47. Despite receiving a $2,996,600 PPP loan in April 2020 and certifying to SBA that it would use the loan proceeds for permissible purposes, Fresh Acquisitions had no intention of using the funds for those purposes.

48. Instead, the loan funds were comingled with funds from other entities and were used to pay the Individual Defendants' excessive salaries and personal expenses, debt and renovation expenses for other entities, and legal settlements and fees for other entities.

7. *Alamo Dynamic, LLC*

49. Alamo Dynamic, LLC ("Alamo Dynamic") is an LLC formed in Texas.

50. Alamo Dynamic is a manufacturing and distribution company that produces food items for restaurant and grocery companies, including restaurant brands owned by the Entity Defendants in Arizona and other states.

51. Alamo Dynamic is owned by LLCs controlled primarily by the Individual Defendants, along with other related parties.

52. Alamo Dynamic was approved on April 13, 2020 to receive a $1,246,800 PPP loan via Arizona Bank and Trust.

53. Despite receiving a $1,246,800 PPP loan in April 2020 and certifying to SBA that it would use the loan proceeds for permissible purposes, Alamo Dynamic had no intention of using the funds for those purposes.

54. Instead, the loan funds were comingled with funds from other entities and were used to pay the Individual Defendants' excessive salaries and personal expenses, debt and renovation expenses for other entities, and legal settlements and fees for other entities.

**C. Individual Defendants**

55. The Individual Defendants dominate the decision-making and operations of the Entity Defendants and their related entities.

56. The Individual Defendants frequently abused and abuse the corporate form in their management of the Entity Defendants and their related entities, including by

causing the Entity Defendants to improperly use their PPP loan proceeds to pay their excessive salaries and personal expenses, debt and renovation expenses for other entities, and legal settlements and fees for other entities.

1. *Allen Jones*

57. Allen Jones is a founding partner and manager of the Entity Defendants and their related entities.

58. He is also the former president and CEO of the Entity Defendants and their related entities, having stepped down from those positions in or about January 2020.

59. He serves as a manager and as a board member.

60. Jones receives a salary of about $1 million per year.

2. *Jason Kemp*

61. Jason Kemp is another founding partner of the Entity Defendants and their related entities.

62. He served as CFO of the Entity Defendants and their related entities. After Jones' departure as president and CEO, Kemp assumed that role.

63. He also serves as a manager and as a board member.

64. Kemp receives a salary of about $1 million per year.

3. *Larry Harris*

65. Larry Harris is another founding partner of the Entity Defendants and their related entities.

66. Until in or about 2013, he was the president and CEO.

67. He serves as a manager and as chairman of the board of the Entity Defendants and their related entities.

68. Harris receives a salary of about $800,000 per year.

4. *Brian Padilla*

69. Brian Padilla is a junior partner in of the Entity Defendants and their related entities.

/ / /

70. Padilla receives a salary of between $400,000–$500,000 per year and serves as a board member.

71. Padilla is a resident of Arizona.

## III. JURISDICTION AND VENUE

72. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1345 because this action involves a federal question and the United States is a plaintiff. This Court also has subject matter jurisdiction under 31 U.S.C. § 3732(a).

73. The Court may exercise personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because they transact business within this District and the claim arises out of or relates to Defendants' contacts with Arizona.

74. Venue is proper in this District under 31 U.S.C. § 3732(a) because Defendants transact business within this District and the claim arises out of or relates to Defendants' contacts with Arizona. Venue is also proper under 28 U.S.C. § 1391(b).

75. This Complaint is not based on a public disclosure as defined in 31 U.S.C. § 3730(e). Relator sues as the original source of information regarding Defendants' violations of the FCA, given that Relator has direct and independent knowledge of the information on which the allegations are based and/or knowledge that is independent of and materially adds to any allegations or transactions that may have been publicly disclosed (although Relator knows of no such public disclosure).

76. No allegation in this Complaint is based on a public disclosure of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or from the news media. Rather, Relator is the original source under 31 U.S.C. § 3730(e)(4).

## IV. THE FEDERAL FALSE CLAIMS ACT

77. The FCA makes it unlawful for any person to submit, directly or indirectly, false or fraudulent claims for payment to the Government. *See* 31 U.S.C. §§ 3729, *et seq.* Originally enacted in 1863, the FCA was substantially amended in 1986 by the False

Claims Amendments Act. The 1986 amendments enhanced the Government's ability to recover losses sustained because of fraud against the United States. Relator alleges liability primarily under three of the FCA's seven liability provisions.

78. First, the FCA's "presentment" provision, 31 U.S.C. § 3729(a)(1)(A), imposes liability when a defendant (a) made, or caused to be made, a claim, (b) that was false or fraudulent, (c) knowing of its falsity.

79. Second, the FCA's "false records or statements" provision, 31 U.S.C. § 3729(a)(1)(B), imposes liability when a defendant (a) made, used, or caused to be made or used, a record or statement, (b) that was knowingly false, and (c) that was material to a false or fraudulent claim.

80. Third, the FCA's "conspiracy" provision, 31 U.S.C. § 3729(a)(1)(C), imposes liability when a defendant conspires to commit a violation of the FCA.

81. The "knowledge" element of the FCA is defined as (1) "actual knowledge of the [falsity of the] information"; (2) "deliberate ignorance of the truth or falsity of the information"; or (3) "reckless disregard of the truth or falsity of the information" provided to the Government. 31 U.S.C. § 3729(b)(1)(A). No specific intent to defraud need be shown. 31 U.S.C. § 3729(b)(1)(B).

82. Under the FCA, the term "claim" means any request or demand for money, whether under a contract or otherwise, presented to an officer, employee, or agent of the United States. 31 U.S.C. § 3729(b)(2)(A)(i). A "claim" is also a request or demand for money made to a contractor or other recipient if (a) the money is to be spent or used on the Government's behalf or to advance a Government program or interest and (b) if the Government provides, has provided, or will reimburse such contractor or other recipient for any portion of the money requested or demanded. 31 U.S.C. § 3729(b)(2)(A)(ii).

83. The FCA defines "material" objectively to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The Supreme Court reaffirmed the natural tendency materiality test—even as to subsection (a)(1)(A), which does not explicitly use the term—and

described a holistic approach to analyzing it. *See Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016).

84. The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to sue on behalf of the Government and to share in any recovery. 31 U.S.C. § 3730(b).

## V. FACTS

### A. The CARES Act and the PPP Program

85. To curb the spread of COVID-19, federal, state, and local governments implemented public health measures with substantial consequences for businesses.

86. Many small businesses were temporarily closed.

87. To help companies affected by the spread of COVID-19, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") created emergency relief for businesses affected by the COVID-19 crisis. *See* Pub. Law 116–136.

88. Among other programs, the CARES Act created a low-interest (1.00%) Paycheck Protection Program ("PPP")[7] loan as a part of the Small Business Administration's existing section 7(a) loan program, which allowed many small businesses to apply for loans through private financial institutions.

89. Like other section 7(a) loans, PPP loans are initially funded by authorized private lenders, with repayment guaranteed by the SBA to make the loans easily saleable on the secondary market.

90. To encourage lenders to make these loans, and to do so quickly, the SBA gave lenders delegated authority to issue the loans based solely on the borrower's certifications and imposed on the lenders only minimal document review requirements. 85 Fed. Reg. 20811-01, Part III.3.a.iv. and b.

91. The SBA paid lenders an origination fee for First Draw PPP loans made before December 27, 2020, as follows:

---

[7] *See generally* https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program (last accessed May 16, 2021).

i. 5% for loans of more than $50,000 and not more than $350,000;

ii. 3% for loans of more than $350,000 and not more than $2,000,000; and

iii. 1% for loans of at least $2,000,000.[8]

92. For First Draw PPP loans made on or after December 27, 2020, the SBA added a tier for loans under $50,000, upon which it paid an origination fee of 50% or $2,500, whichever is less.[9]

93. For Second Draw PPP loans, which cannot exceed $2 million, the SBA paid lenders an origination fee at the same rates noted in the prior two paragraphs.[10]

94. To qualify for forgiveness, PPP loan proceeds must be used for authorized business purposes within the "loan forgiveness covered period," which is the 24-week period beginning on the disbursement date (except that, for loans made before June 5, 2020, the borrower may elect to use the original 8-week period that was defined in the law in force at that time). 85 Fed. Reg. 36308-01, 36310 Part III.c. (revising 85 Fed. Reg. 20811, 20813 Part III.2.n.).

95. Within 10 months after the loan forgiveness covered period, the borrower may seek partial or full loan forgiveness by submitting to the lender an application for forgiveness and documentation showing that the funds were used for approved purposes during the requisite period of time.

96. Upon approval of the forgiveness application by the lender and the SBA, the SBA then pays the loan in full.

/ / /

/ / /

---

[8] 85 Fed. Reg. 20811, 20816 Part III.2.d.; *see SBA Procedural Notice 5000-20091* (eff. Feb. 8, 2021) (available at: https://www.sba.gov/sites/default/files/2021-02/Procedural%20Notice%205000-20091%20-%202nd%20Updated%20PPP%20Processing%20Fee%20and%201502%20Reporting-508.pdf) (last accessed May 16, 2021).

[9] *Id.*

[10] *Id.*

97. The CARES Act allowed PPP loan proceeds to be used for payroll, continuation of group health care benefits and insurance premiums, salaries and other compensation, rent, utilities, and interest on prior debt. 15 U.S.C. § 636(a)(36)(F)(i).

98. Congress left further details to the SBA, directing that the agency should issue guidance and regulations implementing the PPP program within 30 days. Pub. Law 116–136 § 1106(k).

99. On April 2, 2020, the SBA promulgated and published on its website the First Interim Final Rule implementing the PPP program, which was published in the Federal Register two weeks later. *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811-01 (Apr. 15, 2020) (effective Apr. 15, 2020).[11]

100. Two months later, upon passage of the June 5, 2020 Paycheck Protection Program Flexibility Act of 2020 ("Flexibility Act"), the SBA promulgated its Revisions to First Interim Final Rule. *See* Business Loan Program Temporary Changes; Paycheck Protection Program—Revisions to First Interim Final Rule. 85 Fed. Reg. 36308-01 (June 16, 2020) (various effective dates).

101. In broad terms, the Flexibility Act and Revisions to First Interim Final Rule:

i. expanded the time during which the loan proceeds could be spent (from eight weeks to 24 weeks after disbursement, which are now defined as the "loan forgiveness covered period");

ii. expanded the payment deferment period (from six months after disbursement to final determination by the SBA of an application for forgiveness timely submitted within 10 months after the "loan forgiveness covered period"); and

///

[11] *See* 85 Fed. Reg. 36308 (noting earlier publication on SBA website).

iii. extended the maturity date from two years to five years for loans made on or after June 5, 2020 (and also allowed a five-year maturity on earlier loans upon agreement of the lender and borrower).

102. In these rules, the SBA explained that "[t]he actual amount of loan forgiveness will depend, in part, on the total amount of [eligible costs incurred] over the loan forgiveness covered period." 85 Fed. Reg. 20811, 20813 Part III.2.o. as revised by 85 Fed. Reg. 36308-01, 36311 Part III.d (effective Mar. 27, 2020).

103. In the First Interim Final Rule, the SBA initially explained that although the list of authorized uses for PPP loan proceeds in the CARES Act applied, "at least 75 percent of the PPP loan proceeds shall be used for payroll costs." 85 Fed. Reg. 20811-01, 20814 Part III.2.r. The Revisions to First Interim Final Rule, however, retrospectively changed this requirement to 60% and allows partial forgiveness of the loan so long as at least 60% of the forgiven amount was used for payroll costs incurred during the requisite time period. 85 Fed. Reg. 36308-01, 26310-11 Part III.d. (revising 85 Fed. Reg. 20811, 20813-14 Part III.2.o.) (eff. Mar. 27, 2020).

104. The SBA also explained that "payroll costs" do not include "compensation of an individual employee in excess of an annual salary of $100,000." 85 Fed. Reg. 20811-01, 20813 Part III.2.g.ii.

105. If PPP loan proceeds are used for "unauthorized purposes," the SBA can ask that the money be returned, and if it is knowingly used for unauthorized purposes, the SBA warns that additional liability, including "charges for fraud," may apply. 85 Fed. Reg. 20811-01, 20814 Part III.2.s.

106. To apply for a PPP loan in April 2020, as Defendants did, the SBA required an applicant's representative to certify in good faith that:

i. The applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, ....

///

ii. Current economic uncertainty makes this loan request *necessary to support the ongoing operations of the applicant.*

iii. The funds *will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments; I understand that if the funds are knowingly used for unauthorized purposes, the Federal Government may hold me legally liable such as for charges of fraud.* As explained above, not more than 25 percent of the loan proceeds may be used for non-payroll costs.

iv. Documentation verifying the number of full-time equivalent employees on payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities *for the eight week period following this loan* will be provided to the lender.

v. Loan forgiveness will be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities. As explained above, not more than 25 percent of the forgiven amount may be for non-payroll costs. …

vi. *I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects.* I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law ….

vii. I acknowledge that the lender will confirm the eligible loan amount using tax documents I have submitted. I affirm that these tax documents are identical to those submitted to the Internal Revenue Service. I also understand, acknowledge, and agree that the Lender can share the tax information with SBA's authorized representatives ….

///

85 Fed. Reg. 20811-01, 20814 Part III.2.t. (emphasis added).[12]

107. Lenders began accepting applications for PPP loans on April 3, 2020.[13]

108. Additional facts supporting Defendants' knowledge of and complicity with this cost-shifting fraud are within Defendants' control, and a reasonable opportunity for discovery will provide additional evidentiary support.

## VI. BUFFETS AND RELATED ENTITIES SECURE PPP LOANS.

109. On April 12 and 13, 2020, the Entity Defendants were approved for and received nearly $19 million in PPP loans from Arizona Bank & Trust, as to which the SBA paid the lender a total of about $266,000 in origination fees.

110. Buffets, LLC secured a $10 million PPP loan on April 13, 2020, through Arizona Bank & Trust in Phoenix, as to which the SBA paid the bank a 1% origination fee of $100,000.

111. SBA data show that Buffets represented that the loan would support the retention of 500 jobs.

112. Buffets also represented that the entire loan would be used for payroll.

113. TXFMP Management secured a $1,108,800 PPP loan on April 13, 2020, through Arizona Bank & Trust in Phoenix, as to which the SBA paid the bank a 3% origination fee of $33,264.

114. SBA data show that TXFMP represented that the loan would support the retention of 67 jobs.

/ / /

---

[12] On June 16, 2020, after the certifications at issue here, the SBA revised its interim final rule to allow (1) up to 40 percent of loan proceeds to be used for *permissible* non-payroll purposes and (2) revised documentation requirements. 85 Fed. Reg. 36308-01, 36311 Part III.f.

[13] *See* O'Connell et al., *Following messy start, enormous Paycheck Protection Program shows signs of buttressing economy*, Wash. Post. (Jun. 10, 2020), at https://www.washingtonpost.com/business/2020/06/09/how-effective-is-ppp-small-business/ (last accessed May 16, 2021).

115. TXFMP also represented that the entire loan would be used for payroll.

116. Despite failing to use the PPP loan proceeds for allowable costs, as described in Section VII below, on about March 5, 2021, TXFMP Management was approved for a second PPP loan in the sum of $752,989, although it has not been disbursed by Arizona Bank & Trust.

117. Zio's secured a $1,488,600 PPP loan on April 13, 2020, through Arizona Bank & Trust in Phoenix, as to which the SBA paid the bank a 3% origination fee of $44,658.

118. SBA data show that Zio's represented that the loan would support the retention of 304 jobs.

119. Zio's also represented that the entire loan would be used for payroll.

120. Despite failing to use the PPP loan proceeds for allowable costs, as described in Section VII below, on about March 24, 2021, Zio's was approved for a second PPP loan in the sum of $2 million, although it has not been disbursed by Arizona Bank & Trust.

121. Sushi Zushi secured a $2,094,400 PPP loan on April 12, 2020, through Arizona Bank & Trust in Phoenix, as to which the SBA paid the bank a 1% origination fee of $20,944.

122. SBA data show that Sushi Zushi represented that the loan would support the retention of 325 jobs.

123. Sushi Zushi also represented that the entire loan would be used for payroll.

124. Fresh Acquisitions secured a $2,996,600 PPP loan on April 12, 2020, through Arizona Bank & Trust in Phoenix, as to which the SBA paid the bank a 1% origination fee of $29,966.

125. SBA data show that Fresh Acquisitions represented that the loan would support the retention of 500 jobs.

126. Fresh Acquisitions also represented that the entire loan would be used for payroll.

127. Alamo Dynamic secured a $1,246,800 PPP loan on April 13, 2020, through Arizona Bank & Trust in Phoenix, as to which the SBA paid the bank a 3% origination fee of $37,404.

128. SBA data show that Alamo Dynamic represented that the loan would support the retention of 188 jobs.

129. Alamo Dynamic also represented that the entire loan would be used for payroll.

## VII. DEFENDANTS' VIOLATIONS OF THE FALSE CLAIMS ACT

130. The PPP loans were fraudulently induced: many restaurants were already closed before the loan applications were made, with no plans to re-open.

131. In Buffets' case, the monies were never used for payroll; Buffets and its subsidiaries even clawed back final paychecks from its employees.

132. Defendants' conduct became even more egregious once they received the PPP loan proceeds.

133. The Individual Defendants used the proceeds of the Entity Defendants' PPP loans, including those with open restaurants and employees whose wages could have been supported with those monies, as a slush fund for unauthorized expenses, including enriching themselves and using the funds to pay for improvements, expenses, and liabilities for other entities.

### A. Buffets Restaurant Employees Were Laid Off and Were Never Paid.

134. In late March 2020, the Individual Defendants closed all restaurant locations beneficially owned by Buffets.

135. Consequently, the Individual Defendants had no need to preserve any of the $10 million they received from the PPP program to pay wages, rent, or any other authorized expense.

///

///

///

136. The workers employed at the Buffets restaurants were left in the lurch. Some protested outside their former workplaces after they were suddenly closed and their final paychecks had been withdrawn (clawed back) from their bank accounts.[14]

137. Other workers sued their former employers after being abruptly terminated.[15]

138. These clawed-back paychecks were eventually paid back once Buffets received the PPP money, but no restaurants were reopened and no employees were rehired.

139. Internal emails blamed the rescinded paychecks and closures on a lack of government support during the COVID-19 crisis.

140. In fact, the opposite happened. The Entity Defendants, including Buffets, were about to receive enormous financial support from the government. But they had no plans to use it to support their employees.

**B. The Individual Defendants Used PPP Proceeds for Unlawful Purposes.**

1. *Personal Gain*

141. Individual Defendants used the proceeds of the PPP loans for their own financial benefit in direct contravention of the certifications made to the SBA.

142. The Individual Defendants used between $4.5 and $6 million to pay down their own personal lines of credit with Arizona Bank & Trust.

///

///

---

[14] *See* Nguyen, *Hometown Buffet employees picket Burbank location after being left without pay*, L.A. Times (Apr. 8, 2020), at https://www.latimes.com/socal/burbank-leader/news/story/2020-04-08/hometown-buffet-employees-picket-restaurant-after-being-left-without-pay (last accessed May 16, 2021).

[15] *See* Dailey & Iafolla, *Hometown Buffet Workers Sue Over Layoffs, Wage Violations*, Bloomberg Law (May 21, 2020), at https://news.bloomberglaw.com/daily-labor-report/hometown-buffet-workers-sue-over-mass-layoffs-labor-violations (last accessed May 16, 2021).

143. The Individual Defendants also used the money to support their own inflated salaries of between $400,000 and $1 million, several times higher than any permissible PPP use for payroll.

144. Finally, the Individual Defendants used the PPP loan proceeds to pay debts owed by another, unrelated LLC (Alamo Furr's, LLC), preventing default on a loan for which the Individual Defendants had provided a personal guaranty.

2. *Legal Settlement with Former Business Partner*

145. In 2019, the Individual Defendants and FMP SA Management Group LLC (a related entity controlled by them) were sued in the Western District of Texas by River North Furr's LLC, an Illinois LLC formed to allow its members to invest in Alamo Furr's at the Individual Defendants' behest. *River North Furr's LLC v. FMP SA Mgmt. Grp. LLC et al.*, No. 5:19 civ. 00757-OLG, ECF no. 1 (W.D. Tx. Jun. 27, 2019).

146. The plaintiff, River North Furr's, alleged that defendants — who are the same as the Individual Defendants herein — and FMP SA induced them to invest $1.75 million into their businesses by promising their investment would be repaid with interest in five years.

147. Instead, the Individual Defendants "siphoned millions of dollars from Alamo [Furr's] … and the other entities they controlled to support their lavish lifestyle with exotic cars, boats, homes and foreign travel, thereby causing the companies to default on their obligations…." *Id.* ¶¶ 2, 4.

148. After nearly ten months of litigation, including a motion to dismiss, the case was moving into discovery. River North Furr's had a pending motion to compel the defendants to respond to discovery. *River North Furr's*, ECF no. 50 (Mar. 26, 2020).

149. On March 30, 2020, the defendants sought an extension to their time to respond to the motion to compel, which was granted.

150. On April 23, 2020, while response to the motion was still pending, River North Furr's withdrew its own motion to compel. *River North Furr's*, ECF no. 54 (Apr. 23, 2020).

151. On May 18, 2020, the parties filed a joint stipulation of dismissal. *River North Furr's*, ECF no. 55 (May 18, 2020).

152. Relator understands that the defendants, including the Individual Defendants, settled the case for 100 cents on the dollar – $1.75 million.[16]

153. The timing is no coincidence. The PPP loan proceeds were used to fund settlement of the River North Furr's lawsuit, even though none of the entities that had received PPP loans were named in the lawsuit.

3. *Legal Settlement for Wages and Hours Dispute*

154. In 2013, Buffets was sued by three servers on behalf of a class of workers alleging violations of the Fair Labor Standards Act and state wage-and-hour laws. *Walter et al. v. Buffets, Inc. et al.*, 6:13 civ. 02995-JMC (D.S.C.).[17]

155. In 2016, Buffets filed for bankruptcy in the Western District of Texas. *In re: Buffets, LLC et al.*, No. 16 bk. 50557 (W.D. Tx.).

156. As a part of the bankruptcy, a settlement of the FLSA claims was reached in early 2019.

157. After the close of the bankruptcy case, and after Buffets emerged from bankruptcy protection, Buffets was due to make final payments towards this settlement by March 30, 2020.

///

///

///

---

[16] It is profoundly unusual to settle a lawsuit for the total amount of money demanded by the plaintiff, but that is what the Individual Defendants did in this circumstance once the settlement could be paid with the government's money instead of their own.

[17] The suit was brought against "Buffets, Inc. d/b/a Hometown Buffets, Ryan's, Old Country Buffet, Fire Mountain, Country Buffet," but Buffets, Inc. is not an entity in the Alamo Buffets/Buffets corporate structure. As explained below, the true party in interest was Buffets, LLC, whose bankruptcy trustee assumed control over the case in 2016.

158. The plaintiffs' law firm published an update on its website dated March 30, 2020, indicating that the payment would be delayed and that class counsel was unsure when the payment would be made. No later updates have been posted.[18]

159. Once again, timing is no coincidence. Relator is aware that the PPP loan proceeds were used to make these settlement payments.

4. *Remodeling Restaurants*

160. The Individual Defendants also used proceeds from the PPP loans to pay for substantial renovations at restaurants owned by other entities they controlled.

161. For example, Relator knows Individual Defendants used the Entity Defendants' PPP funds to purchase equipment to set up "ghost kitchens"[19] in Furr's Fresh Buffet locations beneficially owned and controlled by the Individual Defendants.

162. These ghost kitchens were not making food for the restaurants or brands owned by the Entity Defendants, or Furr's Fresh Buffet, but instead were making food for new businesses owned by the Individual Defendants, including Dos Pablos Cantina, Wing and Go, and Hops Burgers.

163. The Individual Defendants also used the Entity Defendants' PPP funds to make structural and cosmetic improvements to several of the Furr's Fresh Buffet locations they beneficially own and control, to transform them from traditional restaurants into food "marketplaces."

164. These equipment purchases and other expenses did not benefit the Entity Defendants or their employees. Instead, they benefitted the Individual Defendants, who improperly used government monies as a part of their shell game-like business operations.

---

[18] https://getmansweeney.com/gsd_cases/buffets-inc/ (last accessed May 16, 2021).

[19] For more information on ghost kitchens, which are professional cooking facilities that produce food only for delivery and take-out, see https://www.cnbc.com/2021/01/15/how-covid-accelerated-the-rise-of-ghost-kitchens.html (last accessed May 16, 2021).

## VIII. CAUSES OF ACTION

**COUNT I – Violation of 31 U.S.C. § 3729(a)(1)(A)**

**(Presentation of False Claims for Payment)**

**(Against All Defendants)**

165. Relator repeats and re-alleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

166. This a claim for treble damages and penalties under the FCA.

167. The FCA, 31 U.S.C. § 3729(a)(1)(A), imposes liability upon those who knowingly present or cause to be presented false claims for payment or approval.

168. Through the acts described above and otherwise, Defendants knowingly presented, or caused to be presented, materially false or fraudulent claims for payment or approval to the United States by applying for and receiving PPP loans guaranteed by the SBA, which loans Defendants certified (expressly in their loan applications and implicitly by accepting and retaining the loan proceeds) would be used for authorized purposes despite the fact that they knew or should have known that the loan proceeds would not be used, and in fact were not used, for those authorized purposes in violation of 31 U.S.C. § 3729(a)(1)(A).

169. Each of the false or fraudulent claims submitted, or caused to be submitted, by Defendants is a separate violation of 31 U.S.C. § 3729(a)(1)(A).

170. The United States was unaware of the false or fraudulent nature of the claims Defendants submitted or caused to be submitted.

171. The false or fraudulent claims Defendants knowingly submitted or caused to be submitted to the United States were material to the United States' decisions to pay origination fees to lenders, to guarantee the loans, and/or to forgive all or part of the loans.

172. Had the United States actually known of the false or fraudulent nature of the claims, it would have been prohibited by law from making corresponding payments.

///

173. Because of these false or fraudulent claims Defendants submitted or caused to be submitted, the United States has been damaged in an amount to be determined at trial.

**COUNT II – Violation of 31 U.S.C. § 3729(a)(1)(B)**

**(Use of False Statements Material to False Claims)**

**(Against All Defendants)**

174. Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

175. This is a claim for treble damages and penalties under the FCA.

176. The FCA, 31 U.S.C. § 3729(a)(1)(B), imposes liability upon those who knowingly make, use, or cause to be made or used false records or statements material to a false or fraudulent claim.

177. Through the acts described above and otherwise, Defendants knowingly made, used, or caused to be made or used false records or statements material to the payment of false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

178. Specifically, for purposes of obtaining or aiding to obtain payment or approval of PPP loans guaranteed by the SBA, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements.

179. Defendants' false certifications and representations were made for the purpose of ensuring that the United States guaranteed the loans and paid the false or fraudulent claims in connection with the loans, which was a reasonable and foreseeable consequence of Defendants' statements and actions.

180. Each false record, certification, and/or application submitted to the PPP lender and/or the government in support of Defendants' applications for PPP loan issuance and/or forgiveness, and which resulted in the above-described false or fraudulent claims submitted to the government, is a separate false record or statement and a separate violation of 31 U.S.C. § 3729(a)(1)(B).

/ / /

181. The United States was unaware of the falsity of the records, statements, and claims Defendants made or submitted and, because of the inaccuracy of these records or statements, authorized payments to be made, made such payments, and has been damaged.

182. The false records or statements were knowingly made by Defendants in connection with their applications for PPP loan issuance and/or forgiveness and were material to the United States' decisions to guarantee the loans and to make payments in connection with those loans.

183. Had the United States actually known of the false nature of Defendants' representations, it would have been prohibited by law from making corresponding payments.

184. Because of these false records or statements, the United States paid claims, resulting in damages to the United States in an amount to be determined at trial.

**COUNT III – VIOLATION OF 31 U.S.C. § 3729(a)(1)(C)**

**(Conspiracy)**

**(Against All Defendants)**

185. Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

186. This is a claim for treble damages and penalties under the FCA.

187. The FCA, 31 U.S.C. § 3729(a)(1)(C), imposes liability upon those who conspire to commit a violation of another sub-section of the FCA.

188. Defendants knowingly, in reckless disregard, and/or in deliberate ignorance of the truth conspired between themselves, with their employees and administrators, and others, to violate the FCA in the manner set forth in Counts I and II above.

189. In particular, Defendants conspired to submit, or caused to be submitted, false or fraudulent claims related to applying for and receiving PPP loans guaranteed by the SBA, which loans Defendants certified would be used for authorized purposes despite the fact that they knew or should have known the loan proceeds would not be so used,

and in fact were not used for those authorized purposes.

190. Defendants also conspired to knowingly make, use, or cause to be made or used, false records or statements in applying for and receiving PPP loans guaranteed by the SBA, which false records or statements were material to false or fraudulent claims for payment submitted to the government concerning those loans.

191. Had the United States actually known of the false or fraudulent nature of Defendants' representations and claims, it would have been prohibited by law from making corresponding payments.

192. Because of these conspiracies, and the resulting false or fraudulent claims Defendants submitted or caused to be submitted, the United States paid the claims, resulting in damages to the United States in an amount to be determined at trial.

## IX. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff-Relator demands and prays that judgment be entered against Defendants, jointly and severally, as to the federal claims as follows:

i. ordering that Defendants cease and desist from violating the FCA;

ii. directing that each Defendant pay an amount equal to three times the amount of damages the United States has sustained because of such Defendant's actions;

iii. directing that each Defendant, pursuant to the FCA, pay penalties of not less than $11,665 and not more than $23,331 for each Defendant's violation of the FCA;

iv. granting Plaintiff-Relator the maximum amount allowed under 31 U.S.C. § 3729 and/or any other applicable provision of law;

v. directing that each Defendant, jointly and severally, pay Plaintiff-Relator's fees and costs, including attorneys' fees, as provided by the FCA;

vi. directing that each Defendant pay interest on all sums ordered paid;

///

vii. ordering that Plaintiff-Relator recover such other relief as the Court deems just and proper; and

viii. granting such other and further relief as the Court deems just and proper.

## X. REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby requests a trial by jury.

Dated: May 17th, 2021

HALUNEN LAW

/s/ Lon R. Leavitt

Lon R. Leavitt
Arizona Bar No. 035825
One Renaissance Tower
Two North Central Avenue, Suite 1800
Phoenix, Arizona 85004
Telephone: (602) 254-6494
Fax: (612) 605-4099
leavitt@halunenlaw.com

POLLOCK COHEN, LLP
Adam Pollock*
Max Rodriguez*
60 Broad Street, 24th Floor
New York, New York 10004
Telephone: (212) 337-5361
adam@pollockcohen.com
max@pollockcohen.com

*Attorneys for Plaintiff/Relator*

(* *pro hac vice* applications to be filed)